EDWARD F. MANGELSDORF AND ALBERT H. MANGELSDORF, RESPONDENTS, v. THE PENNSYLVANIA FIRE INSURANCE COMPANY, A CORPORATION, APPELLANT.*—26 S. W. (2d) 818.

St. Louis Court of Appeals. Opinion filed April 8, 1930.

*Corpus Juris-Cyc. References: Appeal and Error, 3CJ, section 741, p. 830, n. 83; Fire Insurance, 26CJ, section 247, p. 202, n. 6; section 428, p. 339, n. 41; section 777, p. 562, n. 62; section 796, p. 577, n. 6; p. 579, n. 25; Indemnity, 31CJ, section 1, p. 419, n. 3; Other, 46CJ, p. 1147, n. 58; Statutes, 36Cyc, p. 1119, n. 36.

*William Waye, Jr.,* and *Silber, Isaacs, Silber & Woley* for appellant.

*Abbott, Fauntleroy, Cullen & Edwards* and *Theodore C. Bruere* for respondents.

BENNICK, C.—This is an action upon a policy of insurance issued by defendant against all direct loss and damage by sprinkler leakage to the contents of certain premises owned by plaintiffs, and located at Main and Victor streets, in the city of St. Louis. Upon a trial to a jury, a verdict was returned in favor of plaintiffs, and against defendants, for the sum of $2226.10 on the face of the policy, $112.04 as interest, $233.81 as damages, and $250 as attorney's fees, or for the aggregate amount of $2821.95. Judgment was rendered in conformity with the verdict, from which, following the overruling of its motion for a new trial, defendant has duly appealed.

Plaintiffs were engaged in the wholesale seed business, which involved the purchase, storage, preparation for resale, and the resale of various kinds of seeds. The building in which the business was conducted measured 225 feet, six inches, by fifty-four feet, two inches; and consisted of a basement, first and second floors, and a cupola built above the roof of the second story. The walls of the building were brick, and the flooring was laid upon beams, which in turn were supported by pillars which stood at intervals throughout the building. The structure itself consisted of two sections which had been built at different times, and which were separated by a brick wall through which openings or doors were made connecting the two sections; but it was nevertheless shown by plaintiffs' evidence that the whole of the structure constituted but one building.

Some time during the night of May 17, 1927, a portion of the second floor, measuring thirty-one feet, six inches, by twenty-four feet, nine inches, collapsed, carrying with it an approximately equal area of the first floor, and precipitating such sections, together with the seeds stored thereon, down into the basement of the building.

The evidence disclosed that the building was equipped with an automatic sprinkler system, consisting of pipes attached to the walls and ceilings, which were fed from a feeder pipe which ran from a point under the basement to a water main in the street. The system was designed so that the sprinkler pipes would ordinarily be filled with air at a sufficient pressure to prevent water from flowing into the pipes. However, in the event that a sprinkler head opened by reason of heat, or on account of corrosion or any mechanical defect in the pipes themselves, the air would escape, with the result that the air pressure would be released, and the water would flow into the pipes and escape through the head, or through the point at which the defect had developed.

The sprinkler system was equipped with what is known as a Potter automatic alarm system, which consisted of a clock-like

device located at a point in the basement of the building near the main valve, so that in the event of a flow of water out of the supply pipes through the main valve and into the sprinkler system itself, an electrical alarm would be sent to the headquarters of the Potter Alarm Company, and in turn relayed to the city fire department. Plaintiffs' evidence disclosed, however, that on certain occasions in the past when the system had not been in correct working order, no alarm had been registered at the Potter headquarters.

It was shown that there were railroad tracks just outside the building, over which trains passed at intervals throughout the day and night, and that the effect of the operation of trains past the building was to cause the building to shake, and the sprinkler pipes to vibrate and rattle in their hangers. It also appears that on an average of six or seven times a year, the system became out of order; and that as soon as a leak would be discovered, steps would be taken to find the break and repair it.

At the time of the loss under the policy, the normal weight of the seeds stored on the second floor was seventy-five pounds to the square foot, and on the lower floor, twenty-five pounds to the square foot, although ordinarily the weights had varied from one hundred to two hundred pounds to the square foot. Plaintiffs' evidence showed further that the effect of allowing the seeds to become saturated with water would be to more than double their weight.

As soon as plaintiffs were informed at their home of the accident that had occurred during the night, they came to the building, and found that water was pouring with great force, not only out of the sprinkler pipes that had been located under the first and second floors, but also out of a tie-in pipe which hung down from the ceiling of the second floor directly over the portion of the floors that had collapsed. The witnesses testified further that even in the second story, the sacks which remained on the floor, as well as the floor itself, were wet for some distance back from the hole, indicating that it had been leakage from overhead, with a resultant increase of weight on the floor, that had caused the floor to give way.

Immediately following the loss, plaintiffs, with their adjuster, met with defendant's adjuster, Mackay, who had been sent by defendant to ascertain and report to it the amount of damage and cause of the loss, whereupon the usual non-waiver agreement was entered into between the parties, providing in effect that no action taken by either party thereto with reference to ascertaining the amount of loss or damage, or investigating any circumstances connected therewith, should be construed as a waiver of any of the terms, conditions, or provisions of the policy, or as

an admission or denial of any liability for the claim made thereunder.

At the same time, Mackay told plaintiffs to salvage the dry seeds and the partially wet seeds as quickly as possible; to hire men to do the work; to rent space in which to dry out and store the seeds; to hire trucks to convey the seeds to such premises; and then to get up an inventory of the damaged merchandise after such of the seeds had been salvaged as were not thoroughly wet, which would be all the information that the company would desire. The evidence shows that Mackay's instructions were complied with by plaintiffs; and that in salvaging the seeds, they expended the sum of $1779.80, and received for certain of the salvaged seeds the sum of $962.09.

While the policy provided that the insured should render the company a proof of loss within sixty days after the leakage occurred, plaintiffs' evidence was, and Mackay himself admitted, that he gave them an extension of time to file their proof until such occasion as under the non-waiver agreement the company should determine whether it would admit or deny liability. Formal proof of loss was made on October 21, 1927, following which defendant denied liability, and the present suit was instituted.

Plaintiffs' petition was in conventional form, alleging a loss under the policy in the sum of $2226.10, and praying judgment against defendant for said sum, together with interest, and the statutory penalty by way of damages and attorney's fees.

In its answer defendant set up three defenses: First, that a material part of the building had fallen, and that whatever loss plaintiffs had sustained was due thereto, and that thereupon said policy had immediately ceased; second, that plaintiffs had stored bags of seeds on the floors far in excess of the capacity thereof, and that by reason thereof the floors had been caused to give way, and the sprinkler pipes to be broken; and, third, that plaintiffs had failed to comply with the provision in the policy requiring written proof of loss to be made within sixty days after the sprinkler leakage, and that by reason of their failure to have given such notice, and of the fact that the time for giving such notice had not been extended in writing by defendant, plaintiffs had not complied with the terms of the policy, and defendant was released from liability thereunder.

The reply filed by plaintiffs was in the form of a general denial.

Having filed a brief containing nineteen assignments of error, counsel for defendant have voluntarily abandoned twelve of their points, leaving for our consideration the determination of the propriety of the giving of three instructions for plaintiffs, the limitation of the cross-examination of one of plaintiffs' witnesses,

and the submission to the jury of the issue of damages for vexatious refusal and by way of attorney's fees.

The first of the instructions criticized is plaintiff's instruction No. 4, which told the jury in substance that even though they might find and believe from the evidence that a portion of the first and second flooring of the building fell before the sprinkler system discharged any water, and that by reason thereof the sprinkler system was broken or loosened in such a way as to discharge water upon the seeds, yet if they should find that defendant sent its adjuster to the building for the purpose of examining and adjusting the loss, and that the adjuster made an examination of the building and of the sprinkler system; that after making such examination, he informed plaintiffs that a material part of the building had not fallen, and that he would advise defendant that plaintiffs should be paid for their loss; that he instructed plaintiffs to salvage and protect the seeds from further loss and damage, and to get a building into which they could remove the damaged goods preparatory to the making of an inventory; that plaintiffs, acting under such instructions from the adjuster, incurred trouble and expense in salvaging the goods, and made and furnished to the adjuster an inventory showing what their loss or damage had been; then, even though portions of the first and second flooring fell before the sprinkler system discharged any water upon the seeds, nevertheless defendant had waived its right to declare the policy void by reason of such fact.

We do not think that any fault is to be found with this instruction. It was positively shown that following the mishap, the adjuster was sent to plaintiffs' premises to ascertain the cause of the loss, and to determine the resulting damage. The adjuster himself testified that he even made a second trip to find out whether the goods were being moved as rapidly as possible so as to conserve the rights of the company. To determine the actual loss which plaintiffs had sustained, it was necessary that the damaged goods be salvaged, and in fact the policy itself provided, as a requirement in case of loss, that the insured should protect the property from further damage, forthwith separate the damaged and undamaged property, put it in the best possible order, and furnish to the company a complete inventory of the damaged property, and the amount claimed thereon. In giving the instructions to plaintiffs as to the steps that they should take to minimize the loss, the adjuster was clearly acting within the scope of his apparent authority.

The cases hold that nowithstanding the signing by the insured of such a non-waiver agreement as was executed in the case at bar, yet if the insurer, in its negotiations or transactions with the insured, after knowledge of the facts which would otherwise

work a forfeiture of the policy, requires the insured, in compliance with the provisions of the policy, to do some act or acts by which trouble or expense is incurred, the right to insist upon a forfeiture will be thereby waived. [Block v. United States Fidelity & Guaranty Co., 316 Mo. 278, 290 S. W. 429; Tinsley v. Aetna Insurance Co., 199 Mo. App. 693, 205 S. W. 78; Schustermann v. Fidelity-Phenix Fire Insurance Co. (Mo. App.), 253 S. W. 91; Painter v. Concordia Fire Insurance Co. (Mo. App.), 256 S. W. 531; Shearlock v. Mutual Life Insurance Co., 193 Mo. App. 430, 182 S. W. 89.]

Here the facts hypothesized in the instruction had ample support in substantial evidence; and if the jury found that in compliance with a definite condition of the policy, the defendant required plaintiffs to incur trouble and expense in salvaging the damaged goods, the waiver of its right to claim a forfeiture of the policy was thereby established. Consequently there was no impropriety in the giving of plaintiffs' instruction No. 4, and defendant's objections to it stand for disapproval.

Complaint is next made of plaintiffs' instructions Nos. 6 and 8, which referred to the defense attempted to be made under that clause of the policy which provided that ''if a building, or any material part thereof, fall except as the result of sprinkler leakage, all insurance by this policy on this building or its contents shall immediately cease.''

By instructions 6 and 8, the court told the jury, as a matter of law, that such clause contemplated the falling of the building, in whole or in part, to such an extent that its usefulness and distinctive character as a building was destroyed or substantially impaired, and that the hazard of the building or its contents to damage by sprinkler leakage was increased. Following this, the jury were informed that if they found that after the falling of a portion of the first and second floors of the building, the same was not rendered unsuitable for its use as an entire building, and its usefulness and distinctive character as a building was not destroyed, or the building or its contents rendered more easily subject to loss or damage by sprinkler leakage, then defendant had no defense to the action by reason of the fact that a portion of the flooring fell.

We have found no case, and none has been cited to us, which deals with a policy containing an exclusion clause of identical language with the one at bar. However, even in those cases construing a clause worded more favorably to the company's contention, such as, ''if the building, or any part thereof, fall,'' and omitting the adjective, ''material,'' which appears in the policy in suit, the courts have held that the language should not receive a technical or strained construction; that where a policy does not

definitely designate what part of a building must fall to avoid the policy, the language must be construed most favorably to the insured; and that a clause of such character, even with the word, "material," omitted, should nevertheless be construed to mean an integral part of the entire building, and to contemplate the fall of such a substantial and important part of the building as to impair its usefulness as such, and to leave the remaining portion subject to an increase in the risk insured against. [London & L. Fire Insurance Co. v. Crunk, 91 Tenn. 376, 23 S. W. 140; Clayburgh v. Agricultural Insurance Co., 155 Cal. 708, 102 Pac. 812; Home Mutual Insurance Co. v. Tomkies & Co., 30 Tex. Civ. App. 404, 71 S. W. 812, aff. 96 Tex. 187, 71 S. W. 814; Phenix Insurance Co. v. Jones, 16 Ga. App. 261, 85 S. E. 206; Nelson v. Traders' Insurance Co., 181 N. Y. 472, 74 N. E. 421.]

Here the testimony of witness Hessenbruch, as well as defendant's Exhibit 10, disclosed that the portion of the flooring which fell represented only two and nine-tenths per cent of the total floor space in the building; and it was shown by other evidence that the machinery, and the greater part of the seeds on hand, were in nowise affected by the occurrence; and that plaintiffs continued to occupy the building, and to conduct their business therein, from the time their damage was sustained up to and including the day of the trial. It appears that the court followed the weight of authority in construing the clause in question, and that under the circumstances of the case it was properly for the jury to determine whether a material part of the building had fallen except as the result of sprinkler leakage. Such being true, there was no error in plaintiffs' instructions Nos. 6 and 8, and the objections interposed against them must be disallowed.

For their next assignment of error, counsel for defendant argue that they should have been permitted on the cross-examination of plaintiffs' witness, Mackay, to ask him the basis of his opinion, which he had theretofore given on direct examination, to the effect that a material portion of the building had not fallen. Suffice it to say of this point that no exception was saved to the ruling of the court sustaining an objection to the question, in view of which the matter is not here for our review.

The final question for decision is the earnest insistence of defendant that the court erred in submitting the issue of statutory damages and attorney's fees as for vexatious delay, upon the theory that sprinkler leakage insurance is not included among any of the forms of insurance mentioned in the statute so as to warrant the imposition of a penalty for vexatious delay, if there was such a delay, which counsel deny.

The damage statute was originally enacted by the Legislature in 1865, and went unchanged until 1911, when the act was amended

to read as it now stands. As originally passed it provided that damages for vexatious delay were recoverable in an action to recover the amount of any loss under a policy of "fire, life, marine, or other insurance." The present statute is section 6337, Revised Statutes 1919, and it will be observed by a comparison of it with the original statute (section 7068, Revised Statutes 1909) that the effect of the amendment of 1911 was to add cyclone, lightning, health, accident, employer's liability, burglary, theft, embezzlement, fidelity, and indemnity insurance to its previous terms. It will be further observed that both as first enacted, and also as amended, the statute contained the concluding phrase, "or other insurance."

There is no doubt about the fact that sprinkler leakage insurance is not expressly mentioned in the statute, and consequently, since the statute is highly penal, and is not to be enlarged in its scope or inclusion beyond its explicit terms or those necessarily to be implied therefrom, the instant case does not fall within the purview of the statute unless sprinkler leakage insurance may be held to be sufficiently included within or covered by one of the forms of insurance definitely mentioned therein. Conceding the propriety of this conclusion, counsel for plaintiffs argue that it may properly fall within the species of "indemnity" insurance, and that in any event it is covered by the phrase, "or other insurance."

We cannot believe that the statute may be construed so as to include sprinkler leakage insurance within the term "indemnity" insurance. In a sense every form of insurance tends to indemnify the policyholder against a loss sustained under his policy, but yet the term, "indemnity insurance," has come to have a very well defined and recognized meaning in insurance parlance. For instance, as contradistinguished from the ordinary form of insurance which is purely a matter of private contract wholly between the parties thereto, it has been judicially defined as the class of insurance "intended to indemnify the insured generally against the consequences of his own acts of negligence which result injuriously to the person or property rights of some third person, and for which he is compelled to respond in damages." [Breeden v. Frankford Marine, Accident & Plate Glass Insurance Co., 220 Mo. 327, 119 S. W. 576.] Obviously the policy at bar was in nowise designed to cover such a contingency; and moreover it occurs to us that if it had been the intention of the Legislature to include within the meaning of the term, "indemnity," as used in the act, all classes and kinds of insurance, it would have been unnecessary in drafting the amendment of 1911 to have made specific mention of the many different kinds of insurance that are enumerated therein.

Likewise plaintiffs' insistence that the policy at bar falls within the phrase, "or other insurance," is disproved, as we view the case, by the necessary application of the *ejusdem generis* rule, which is understood to mean that where a statute contains general words only, such general words are to receive a general construction, but where it enumerates particular classes or things, followed by general words, the general words so used will not ordinarily have a general meaning, but will be limited in their scope to objects of the kind and character specified.

In the case of Mears Minning Co. v. Maryland Casualty Co., 162 Mo. App. 178, 144 S. W. 883, the Springfield Court of Appeals was called upon to construe a policy of employers' liability insurance in the light of the statute as it stood prior to the amendment of 1911. In a carefully considered opinion, the court applied the *ejusdem generis* rule, and after stating the history of the legislation in much the same fashion as we have given it here, held that neither the classes of insurance specifically specified in the statute, nor the general words following afterwards, were sufficient to cover the policy then under consideration. Later this court, in the case of L. Cohen Grocer Co. v. Massachusetts Bonding & Insurance Co. (Mo. App.), 251 S. W. 127, while recognizing that the rule of *ejusdem generis* should be applied to the interpretation of the phrase, "or other insurance," nevertheless held that the application of the rule properly permitted a policy of insurance against robbery to be brought within the purview of the statute, since such a policy was of the same general character and class as insurance against burglary, theft, etc., which are specifically mentioned in the statute.

Obviously, before the words, "or other insurance," can be construed to include a loss under a policy of sprinkler leakage insurance, we must be able to say that it is like some one of the species and kinds of insurance expressly mentioned in the statute. This we cannot do, for to our minds a loss by sprinkler leakage contains no single element of the various risks enumerated by the statute. It follows, therefore, that in the light of the highly penal nature of the statute which requires that it be strictly construed so as not to be held to apply to any class of insurance that is not plainly or necessarily included among its provisions, it was error to submit the question of penalty in the case at bar.

This error, however, is one that may be cured by a *remittitur*. The total amount of the penalty allowed by the jury was the sum of $483.81. Accordingly, the commissioner recommends that if plaintiffs will within ten days remit such sum, the judgment of the circuit court be reversed, and the cause remanded, with directions that a new judgment be entered in favor of plaintiffs,

and against defendant, in the sum of $2338.14, with interest at the rate of six per cent per annum, from and after September 29, 1928, the date of the original judgment; that failing in this, the judgment be reversed, and the cause remanded for a new trial.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court. The judgment of the circuit court is, accordingly, reversed, and the cause remanded, with directions as recommended by the Commissioner, provided plaintiffs enter a *remittitur* of $483.81, within ten days; otherwise the judgment is reversed, and the cause remanded for a new trial. *Becker* and *Nipper*, *JJ.*, concur; *Haid, P. J.*, not sitting.