GAGE & TUCKER, et al., Appellants,

v.

**DIRECTOR OF REVENUE, et al., Respondents.**

Nos. 70556—70564 (Consolidated).

Supreme Court of Missouri, En Banc.

April 18, 1989.

Major W. Park, Jr., Jeffrey W. Bruce, Kansas City, Richard S. Brownlee, III, Jefferson City, for appellants.

Mark W. Stahlhuth, Acting General Counsel, Missouri Div. of Ins., Mark S. Siedlik, Asst. Atty. Gen., Jefferson City, for respondents.

HIGGINS, Judge.

Appellants, Gage & Tucker; Thompson & Mitchell; Lewis & Rice; Armstrong, Teasdale, Kramer & Vaughan; Husch, Eppenberger, Donohue, Elson & Cornfeld; Shook, Hardy & Bacon; Stinson, Mag & Fizzell; Shughart, Thomson & Kilroy P.C.; and Greensfelder, Hemker, Wiese, Gale & Chappelow P.C. are law firms with their principal offices in Missouri. They paid under protest a surplus line tax assessed on premiums paid to Attorneys Liability Assurance Society, Ltd. (ALAS) to indemnify them for potential losses as a result of legal malpractice. Their subsequent claims for refund were denied by respondent, Director of Revenue. The taxpayers petitioned for review before the Administrative Hearing Commission to contest the decisions of the Director of Revenue. The

Director of the Missouri Division of Insurance was added as a party respondent.

The taxpayers contended that the "professional indemnity policy" procured from ALAS is not "insurance" as contemplated by chapter 384, RSMo 1986 (the Surplus Line Law),[1] consequently the surplus line tax imposed by section 384.160 does not apply; and that the tax imposed by section 384.160 violates the United States and Missouri Constitutions. The AHC concluded that the taxpayers' procurement of the professional indemnity policies from ALAS fell within the purview of chapter 384 and is subject to the tax imposed by section 384.-160; and upheld the denial of refunds.

The taxpayers then petitioned this Court for review alleging: (1) the professional indemnity policy is not an insurance policy as contemplated by chapter 384, consequently the surplus line tax imposed by section 384.160 does not apply; (2) the imposition of the tax violates the due process clause of the fourteenth amendment of the United States Constitution and article I, section 10 of the Missouri Constitution; (3) the imposition of the tax violates the equal protection clause of the fourteenth amendment of the United States Constitution and article I, section 2 of the Missouri Constitution; (4) the imposition of the tax violates the uniformity clause of article 10, section 3 of the Missouri Constitution; (5) the imposition of the tax violates the commerce clause of article I, section 10 of the United States Constitution; and, (6) the imposition of the tax violates the import-export clause of article I, section 10 of the United States Constitution. Affirmed.

The facts are stipulated. Each law firm entered into a contract with ALAS, a Bermuda Corporation whose office is in Hamilton, Bermuda. ALAS has no officers or employees located in Missouri. ALAS is not qualified to do business in Missouri as a foreign corporation or insurance company. ALAS does not mail solicitation literature into Missouri, nor does it advertise its business in publications which originate or are circulated in Missouri. Each law firm completed an application at its respective office in Missouri seeking to enter into a contract with ALAS and forwarded that application to ALAS at its office in Bermuda. Each firm also forwarded a premium check to ALAS from its respective Missouri office. ALAS accepted each firm's application and premium check and issued a "professional indemnity policy" in its favor. ALAS did not mail copies of the policies to the firms, but kept them in its office files in Bermuda where they could be inspected and copied by representatives of any firm.

The AHC upheld the Director of Revenue's denial of claims for refund, but declined to address the constitutional attacks following this Court's previous decisions in *City of Joplin v. Industrial Com'n of Missouri*, 329 S.W.2d 687 (Mo. banc 1959); *Gershman Inv. Corp. v. Danforth*, 517 S.W.2d 33 (Mo. banc 1974); *State Tax Com'n v. Administrative Hearing Com'n*, 641 S.W.2d 69 (Mo. banc 1982); *see also Duncan v. Missouri Bd. for Architects, Professional Engineers and Land Surveyors*, 744 S.W.2d 524 (Mo.App.1988).

As stated in *City of Springfield v. Fredricks*, 630 S.W.2d 574 (Mo.1982):

Missouri taxes several phases of the insurance industry, principally by use of a "premium tax" measured by a percentage of the premiums collected by the insurers as the result of business done in this State. *See* § 148.370, RSMo 1978. Not all risks in this State that are insured are covered by policies written by carriers admitted to do business in this State. Insurance risks ... are frequently written by carriers not admitted to do business in Missouri, and such carriers are referred to as surplus line insurers.

*Fredricks* at 575.

In 1977 the legislature adopted "the Surplus Line Law," chapter 384, RSMo 1986. Section 384.160.4 imposes a tax upon the insured who obtains coverage from a sur-

---

1. Each section of chapter 384, RSMo 1986, has been repealed. H.B. 700 § A (1987). Nevertheless, this case involves the construction of the statutes as they were in effect in 1985 when the taxes were imposed, assessed and collected pursuant to section 384.160, RSMo 1986. For the current Surplus Lines Law see chapter 384, RSMo Supp.1988.

plus line insurer in an amount equal to five percent of the premiums paid on insured risks in Missouri. The amount of the tax is computed, assessed and collected by the Director of the Division of Insurance who transmits the sums collected to the Director of Revenue.

Chapter 384 regulates surplus line insurance, defined in section 384.020(6) as:

any direct insurance, other than wet marine and transportation insurance, in respect of risks resident, located, or to be performed in this state, underwritten by a surplus line insurer.

Section 384.020(7), RSMo, defines a "surplus line insurer" as:

any insurer not possessing a certificate of authority to transact insurance in Missouri.

Where insurance subject to the Surplus Line Law is procured without the services of a "surplus line broker," as defined in section 384.020(5), RSMo, the provisions of section 384.160, RSMo, become operative:

1. Every insured in this state who procures or causes to be procured or continues or renews insurance in any surplus line insurer, or any self-insurer in this state who so procures or continues with, any surplus line insurer, excess of loss, catastrophe or other insurance, upon a subject of insurance resident, located or to be performed within this state, other than insurance procured through a surplus line broker pursuant to sections 384.010 to 384.150, shall before March second of the year next succeeding the year in which the insurance was so procured, continued or renewed, file a written report of the same with the director [of the Division of Insurance] on forms prescribed by the director and furnished to such an insured upon request. The report shall show:

(1) The name and address of the insured or insureds;

(2) The name and address of the insurer or insurers;

(3) The subject of the insurance;

(4) A general description of the coverage;

(5) The amount of premium currently charged therefor;

(6) Such additional pertinent information as may be reasonably requested by the director.

2. If any such insurance covers also a subject of insurance resident, located or to be performed outside this state, for the purposes of this section, a proper pro rata portion of the entire premium payable for all such insurance shall be allocated as to the subjects of insurance resident, located or to be performed in this state.

3. Any insurance in a surplus line insurer procured through negotiations or an application in whole or in part occurring or made within or from within this state, or for which premiums in whole or in part are remitted directly or indirectly from within this state, shall be deemed to be insurance procured or continued or renewed in this state within the intent of subsection 1 of this section.

4. For the general support of the government of this state there is levied upon the insured who procures insurance pursuant to subsections 1 and 3 of this section a tax at the rate of five percent of the net amount of the premium in respect of risks located in this state. Before April sixteenth of the year next succeeding the year in which the insurance was so procured, continued or renewed, the insured shall remit to the director the amount of the tax. The director before June first of each year shall certify and transmit to the director of revenue the sums so collected.

5. The tax shall be collectible from the insured by civil action brought by the director, and by the seizure, distraint and sale of any property of the insured situated in this state.

Section 384.160, RSMo 1986.

I.

◼ The taxpayers contend that the "professional indemnity policy" procured from ALAS is not "insurance" as contemplated in the statutes, therefore the five percent net premium tax imposed by section 384.160.4 does not apply. The taxpay-

ers argue the difference between a traditional insurance policy and the indemnity policy they purchased takes their indemnity policy out of the statutory definition of "direct insurance ... underwritten by a surplus line insurer." Their premise is that the word "direct" as used in the statute makes a distinction between traditional malpractice policies and indemnity policies. Under the terms of the professional indemnity policy, ALAS will indemnify the firms for covered costs, charges and expenses arising out of any claim made against them for legal malpractice. Unlike traditional insurance it provides for indemnification only after the insured has settled a claim or satisfied a judgment against it. Additionally, ALAS is under no obligation to defend in the event a claim is made or lawsuit is filed against the taxpayers.

This Court rejects the taxpayers' argument that the surplus line tax does not apply because the indemnity policy is not "direct insurance." No legislative intent to distinguish between indemnity insurance and traditional insurance is demonstrated by the use of the word "direct" in section 384.020(6).

The taxpayers also cite *Manglesdorf v. Pennsylvania Fire Ins. Co.*, 224 Mo.App. 265, 26 S.W.2d 818 (1930), for authority that a professional indemnity policy is not insurance. Reliance on *Manglesdorf* for this proposition is misplaced. The court in *Manglesdorf* determined that an indemnity policy is a class of insurance, accepting the holding in *Breeden v. Frankfort Marine, Accident & Plate Glass Ins. Co.*, 220 Mo. 327, 119 S.W. 576 (1909), that:

> [A]n ordinary contract of fire insurance is purely a matter of private contract wholly between the parties thereto, and affects only the property of the insured. But that is not the case in what is called indemnity insurance. This class of insurance is intended to indemnify the assured generally against the consequences of his own acts of negligence which result injuriously to the person or property rights of some third person and for

which he is compelled to respond in damages.

*Breeden,* 220 Mo. at 360, 119 S.W. at 584.

## II.

The taxpayers contend that the surplus line tax imposed by section 384.160 violates the equal protection clause of the fourteenth amendment of the United States Constitution and the equal protection clause of article I, section 2, of the Missouri Constitution. Sections 384.010 *et seq.* apply to Missouri residents who procure insurance from a "surplus line insurer," defined as "any insurer not possessing a certificate of authority to transact insurance in Missouri." § 384.020(7), RSMo 1986. These statutes do not apply to Missouri residents who procure insurance from an insurer qualified to do business in Missouri. Section 384.160.4 imposes a five percent net premium tax on insurance procured from a surplus line insurer. Missouri residents who procure insurance from a company possessing a certificate of authority to transact insurance in Missouri are not assessed a tax on their premiums. Instead, the admitted insurance company is assessed a two percent tax on the premiums it receives. §§ 149.340, 148.370, RSMo 1986.

To withstand an equal protection attack this classification must be rationally related to achievement of a legitimate state purpose. *Western and Southern Life Ins. Co. v. State Bd. of Equalization of California,* 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981); *Missouri Pacific R. Co. v. Kirkpatrick,* 652 S.W.2d 128 (Mo. banc 1983). Purposes asserted for the tax include (1) to generate revenue for the general support of the government of this state, (2) to protect the public by discouraging residents from purchasing insurance from a company not admitted to transact business thereby not subject to protective state regulations, and (3) to protect the public by encouraging residents to purchase insurance from a company admitted to transact business because these companies are members of the Missouri Insurance Guarantee Association, which provides protections against insolvency. *See*

§ 375.785, RSMo 1986. These are legitimate state purposes,[2] and section 384.160 is rationally related to these purposes. The tax imposed by section 384.160.4 does raise revenues and provide encouragement to Missouri citizens to purchase insurance from a company subject to state regulation.

### III.

The taxpayers contend to the extent that the premium tax rate assessed against them exceeds the tax rate assessed against insurers under chapter 148, RSMo 1986, section 384.160.4 violates the uniformity clause, Mo. Const. art X, § 3:

> Taxes may be levied and collected for public purposes only, and shall be uniform upon the same class or subclass of subjects within the territorial limits of the authority levying the tax.

■ The General Assembly has discretion to make classifications for taxation purposes without violating the constitutional provision that taxes shall be uniform on the same class of subjects, however, persons to be taxed may not be classified without reason. *State ex rel. Transport Mfg. & Equipment Co. v. Bates,* 359 Mo. 1002, 224 S.W.2d 996 (1949). The rule of uniformity permits the legislative creation of reasonable classifications in the furtherance of public good. *Bates* at 1000. As set out above, it is for the protection of the public that there is a difference in the tax schemes of chapter 148 and chapter 384. Further, the taxes are assessed uniformly to the particular classifications drawn by the statutes.

### IV.

■ The taxpayers contend that the surplus line tax imposed by section 384.160 violates the commerce clause of the U.S. Constitution. U.S. Const. art. I, § 8, cl. 3. The Director's initial response to the commerce clause attack is that it is foreclosed by the McCarran–Ferguson Act, 15 U.S.C., §§ 1011–1015 (1982). "The purpose of the McCarran–Ferguson Act is to allow the States to regulate interstate commerce between insurance companies of one State and the customers of another State. *S.E.C. v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), makes it clear that the intention of the McCarran–Ferguson Act is to allow the States to regulate 'directly or indirectly' such relationship." *Feldman v. State,* 96 Nev. 614, 615 P.2d 238, 241 (1980). The United States Supreme Court in *Western & Southern Life Ins. Co.,* held:

> Our decisions do not, however, limit the authority of Congress to regulate commerce among the several States as it sees fit. In the exercise of this plenary authority, Congress may "confe[r] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy." [Citations omitted.] If Congress ordains that the States may freely regulate an aspect of interstate commerce, any action taken by a State within the scope of the congressional authorization is rendered invulnerable to Commerce Clause challenge.

> Congress removed all Commerce Clause limitations on the authority of the States to regulate and tax the business of insurance when it passed the McCarran–Ferguson Act. [Citations omitted.]

*Western and Southern Life Ins. Co.,* 451 U.S. at 652–3, 101 S.Ct. at 2074–5, 68 L.Ed. 2d at 521–2.

### V.

■ The taxpayers contend the surplus line tax imposed by section 384.160 consti-

---

2. The taxpayers cite *Williams v. Vermont,* 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985); *Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985); and *Western and Southern Life Ins. Co. v. State Bd. of Equalization of California,* 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981), for authority that the asserted purposes are not legitimate. Reliance on these cases for such a proposition is misplaced. These cases held it was not a legit-

imate state purpose to promote domestic business within a state by discriminating against foreign corporations that wish to compete by doing business there. This case is distinguishable because the statutory tax scheme does not discriminate between domestic and foreign insurance companies, but rather encourages Missouri residents to purchase insurance from a company subject to state regulation irrespective of its classification as domestic or foreign.

tutes an impermissible laying of a duty on an export in violation of the import-export clause. The import-export clause provides: "No state shall, without the consent of Congress, lay impost or duties on imports or exports...." U.S. Const. art I, § 10, cl. 2. The taxpayers cite no authority, and this Court finds none, for their position that premium checks sent to ALAS in Bermuda are exports for purposes of this clause of the Constitution. To the contrary, it has been held that a bill of exchange is neither an export nor an import. *Nathan v. Louisiana*, 49 U.S. 73, 8 How. 73, 12 L.Ed. 993 (1850). The Court reasoned a bill of exchange is merely a note ordering the payment of money, which may be negotiated by endorsement, and the liability of the names that are on it depend upon certain acts to be done by the holder, when it becomes payable. No distinction exists between the taxpayers' checks and a bill of exchange for purposes of the import-export clause.

### VI.

█ The taxpayers contend the surplus line tax imposed by section 384.160 violates due process. U.S. Const. Amend. 14; Mo. Const. art. I, § 10. Due process prohibits a state from requiring anyone within its jurisdiction to "pay tribute to it for contracts or money paid to secure benefit of contracts made and to be performed outside the state." *Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 48 S.Ct. 100, 72 L.Ed. 177 (1927). The taxpayers argue the State of Missouri does not have sufficient contacts with their procurement of the professional indemnity policies from ALAS to assess upon them the tax imposed by section 384.160, without violating due process. *State Bd. of Ins. v. Todd Shipyards Corp.*, 370 U.S. 451, 82 S.Ct. 1380, 8 L.Ed.2d 620 (1962); *Compania General de Tabacos de Filipinas; St. Louis Cotton Compress Co. v. Arkansas*, 260 U.S. 346, 43 S.Ct. 125, 67 L.Ed. 297 (1922); and *Allgeyer v. Louisiana*, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897).

Doubts regarding the continued vitality of *Allgeyer, St. Louis Cotton Compress,* and *Compania General de Tabacos de Filipinas* after enactment of the McCarran–Ferguson Act, 15 U.S.C., §§ 1011–1015 (1982), were raised in *Osborne v. Ozlin,* 310 U.S. 53, 60 S.Ct. 758, 84 L.Ed. 1074 (1940), and *Hoopeston Canning Co. v. Cullen,* 318 U.S. 313, 63 S.Ct. 602, 87 L.Ed. 777 (1943). These doubts were put to rest in *Todd Shipyards* where the United States Supreme Court held that although the McCarran–Ferguson Act gives the state the authority to regulate and tax the business of insurance, such regulation and taxation should be kept within the due process limits set by *Allgeyer* and the cases following it.

In *Allgeyer* a Louisiana statute imposed a fine on residents who entered into insurance contracts with foreign insurance companies that had not complied with the state laws requiring a license and authorized agent in the state. The insurance policy at issue in *Allgeyer* provided coverage for cotton while in transit from New Orleans to foreign ports. The policy was written in New York with a New York insurer. The premiums were paid in New York and so were the losses. The only activity in Louisiana and under the policy was a letter sent to New York advising the insurer of the property covered for each shipment.

> The supreme court of Louisiana says that the act of writing within that state the letter of notification was an act therein done to effect an insurance on property then in the state, in a marine insurance company which had not complied with its laws, and such act was therefore prohibited by the statute. As so construed we think the statute is a violation of the fourteenth amendment of the federal constitution in that it deprives the defendants of their liberty without due process of law.

*Allgeyer,* 165 U.S. at 589, 17 S.Ct. at 431, 41 L.Ed. at 835.

In *St. Louis Cotton Compress* an Arkansas statute imposed a five percent tax on gross premiums paid to insurance companies not authorized to do business in Arkansas. A Missouri corporation authorized to do business in Arkansas entered into an

insurance contract in Missouri to cover property located in Arkansas. The insurance company was not authorized to do business in Arkansas, therefore the tax was imposed. The court struck down the statute on due process grounds holding the tax did not differ from the fine imposed in *Allgeyer.*

In *Compania General de Tabacos de Filipinas* a tobacco company incorporated in Spain and licensed to do business in the Philippine Islands was charged a tax on the premiums charged to it by its main office in Spain for insurance procured from a Paris corporation. The insurance covered the tobacco company's property located in the Philippine Islands. The court held:

> The effect of [*Allgeyer* and *St. Louis Cotton Compress*] is that, as a state is forbidden to deprive a person of his liberty without due process of law, it may not compel any one within its jurisdiction to pay tribute to it for contracts or money paid to secure the benefit of contracts made and to be performed outside of the state.

*Compania General de Tabacos de Filipinas,* 275 U.S. at 94–95, 48 S.Ct. at 103, 72 L.Ed. at 181.

In *Todd Shipyards* a Texas statute imposed a five percent tax on premiums paid insurers not licensed to do business in that state. The insurance policy at issue in *Todd Shipyards* covered property damage on property located in Texas. The insurance company was not licensed to do business in Texas. The insured was not a domiciliary of Texas, but a New York corporation. The insurance policy was negotiated and paid for outside of Texas. All losses arising under the policy were adjusted and paid outside Texas. "The only connection between Texas and the insurance transactions is the fact that the property covered by the insurance is physically located in Texas." *Todd Shipyards,* 370 U.S. at 455, 82 S.Ct. at 1383, 8 L.Ed.2d at 624.

*Todd Shipyards* has been interpreted to mean "no more than this, that insurance transactions of the kinds involved in *Todd Shipyards* ... cannot be taxed or regulat-

ed if the only connection with the State is the location therein of the risk insured, but the State may deal with the insurance if activities either in the making or in the performance of the contract occur within its borders." *Howell v. Rosecliff Realty Co.,* 52 N.J. 313, 245 A.2d 318, 323 (1968). The court in *Howell* further stated, "[T]he plain inference from *Todd Shipyards* is that if there were activity within a State either in the making or the performance of the contract, the State could exercise its governmental powers to further its undoubted interest in insurable risks within its borders." *Howell* at 325.

■ In this case the taxpayer insureds are Missouri partnerships or professional corporations having their principal place of business in Missouri. The professional indemnity policy insures against risk of committing legal malpractice in Missouri. The application for the policy was prepared in and mailed from Missouri. The premium check for the policy was sent from Missouri. Further, Missouri has a legitimate interest in regulating the insurance industry for the protection of its residents. Indemnity policies for acts of legal malpractice are matters of state concern, not only with respect to the security of the insured, but also with respect to compensation of the victims of legal malpractice. For these reasons and because ALAS has purposely availed itself of the benefits of conducting business within Missouri with Missouri law firms, insuring against acts of legal malpractice committed in Missouri, this Court finds sufficient connection in the contract between ALAS and the taxpayers and this state to conclude due process is not violated by the assessment of the tax imposed by section 384.160.4.

The decision of the Administrative Hearing Commission is affirmed.

BILLINGS, C.J., and BLACKMAR, ROBERTSON, RENDLEN and COVINGTON, JJ., concur.

WELLIVER, J., dissents in separate opinion filed.

WELLIVER, Judge, dissenting.

I respectfully dissent. The Missouri Bar Association recently created a self insur-

ance company whereby many Missouri lawyers can and do self insure themselves for legal malpractice. I do not believe that virtually all of the major law firms of this state, the appellants herein, can 1) totally be wrong in their understanding of the law of due process and equal protection, and 2) totally be wrong in what appears to be their belief that they are utilizing the proper and most efficient and cost effective method of protecting the citizenry of this state against their possible legal malpractice.

The result achieved by the principal opinion—taking away this 5% of the price paid for the indemnity, which might be used for protecting the citizenry of this state against possible legal malpractice, and giving it to the state without giving the state the ability to either regulate or control that which is being done, is in my opinion but one more example of this Court's insatiable appetite to levy and impose taxes. See *Boatmen's Bancshares v. Director of Revenue*, 757 S.W.2d 574, 581 (Mo. banc 1988) (Welliver, J., dissenting).

I believe that under *Allgeyer v. Louisiana*, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897); *St. Louis Cotton Compress Co. v. Arkansas*, 260 U.S. 346, 43 S.Ct. 125, 67 L.Ed. 297 (1922); *Compania General de Tabacos de Filipinas v. Collector*, 275 U.S. 87, 48 S.Ct. 100, 72 L.Ed. 177 (1927); and *State Board of Insurance v. Todd Shipyards*, 370 U.S. 451, 82 S.Ct. 1380, 8 L.Ed. 2d 620 (1962), the tribute to the state levied herein for buying from a foreign country is totally violative of due process. Under *Western and Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981) and *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985), it is equally violative of equal protection.

The decision of the Administrative hearing Commission should be reversed.